## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JACQUELINE A. WATKINS,

    Plaintiff,

    v.

CITY OF CHICAGO, ET AL.,

    Defendants.

Case No. 24-cv-04467

Judge Martha M. Pacold

## MEMORANDUM OPINION & ORDER

Plaintiff, proceeding *pro se*, brought several claims under both 42 U.S.C. § 2000e and 42 U.S.C. § 1983 for her treatment by the Chicago Police Department. Certain defendants (the City of Chicago and certain individual defendants), in turn, moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6). [19]. Because plaintiff's theories all suffer from legal defects, defendants' motion to dismiss, [19], is granted in its entirety. If plaintiff can do so consistent with this opinion and Fed. R. Civ. P. 11, she may file by October 30, 2025 a motion for leave to amend the complaint, as this opinion is the court's first ruling on the merits. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 518 (7th Cir. 2015).

## BACKGROUND

Plaintiff Jacqueline Watkins, an African American woman, was a member of the Chicago Police Department from July of 1999 through August 15, 2023. [1] ¶¶ 1, 6.[1] She served as a "beat patrol officer" for 18 years, before being transferred (at her request) in 2017 to become a Crisis Intervention Team ("CIT"/De-escalation) Instructor at CPD's Training Academy. *Id.*

Plaintiff asserts that CIT was her dream job, but that problems arose, including a verbal altercation with a colleague, Officer Joaquin Rodgers. "On or around September 6, 2019," plaintiff alleges, Officer Rodgers "became enraged that Plaintiff would not do his assigned work"; that work was helping other officers carry cases of water and snacks into the Training Academy. *Id.* ¶¶ 32–33. After yelling about "what type of person" plaintiff was, Rodgers then proceeded to "jump out of his seat" and "yell at Plaintiff," claiming that she "always play[s] the victim" and telling

---

[1] Bracketed numbers refer to docket entries and are followed by page and / or paragraph number citations. Page numbers refer to the CM/ECF page number.

her "[don't] ever talk to [him]," etc. *Id.* ¶¶ 33–34. Plaintiff alleges that this verbal altercation was the result of Rodgers being angry that she broke the Chicago PD's "Code of Silence"—an alleged code that police don't snitch on one another, *see id.* ¶¶ 115–18—by filing a discrimination lawsuit. *Id.* ¶ 32.[2] After the initial argument, plaintiff alleges Rodgers went to help the other officers but then came back and yelled at her again—this time (at least) with others in earshot. [1] ¶¶ 36–37 (stating that an Officer Cade was "standing by [Rodgers' side]" and an Officer Cho was "in the office"). Plaintiff does not allege that the other officers joined in; rather, she alleges that Officer Cho recognized that "something [was] wrong with" Officer Rodgers and that plaintiff "handled the situation well." *Id.* ¶ 37.

Plaintiff reported the "verbal assault" to Defendant Ursitti who, she alleges, "did nothing." *Id.* ¶ 38. Plaintiff also "addressed" the "retaliation and harassment in [a] CIT all staff meeting" but, she alleges, "no conflict resolution was deployed." *Id.* ¶ 40. In this meeting, plaintiff alleges that after leveling her accusations, Rodgers yelled and she responded by accusing him of lying. *Id.* ¶¶ 42–44.

Officer Rodgers then asked (in the meeting) to file an incident report—a so-called "To-From report"—but plaintiff objected, telling her supervisors that "there [wa]s no need" and she "ha[d] closure." *Id.* ¶¶ 48–50. Plaintiff was, nonetheless, required to write this report. *Id.* ¶¶ 52–55. According to plaintiff, a Sergeant Monica Reyes "then gaslighted" her "by stating that a To-From statement [was] required because" plaintiff "was 'hostile potentially violent'" (*sic*). *Id.* ¶ 56. Plaintiff also requested to see, but was denied access to, Rodgers' report. *Id.* ¶ 59.

After these events, plaintiff "felt she was a recipient of bullying, harassment, coverup, [and] retaliation," and so she filed internal complaints against Ursitti, Reyes, and Rodgers. *Id.* ¶ 60. These were transferred to the Bureau of Internal Affairs ("BIA"), and the complaint was deemed "Not Sustained"—though she alleges that "a fair investigation did not happen." *Id.* ¶¶ 61, 64, 62. Plaintiff claims the BIA "hid[] and [covered up the] misconduct of officers" in cahoots with the police union. *Id.* ¶ 68. Thus plaintiff "called" the "Chicago Inspector General" to re-open complaints, reporting "inconsistencies, botched investigation[s], defamation, and [a] coverup." *Id.* ¶¶ 69, 72.

Plaintiff alleges that during this reporting, fellow employees gave false testimony about her, accusing her of being "hostile and potentially violent," and "clench[ing] her fist and . . . hitting her fist in her open hand." *Id.* ¶ 73. They further gave statements in which, according to plaintiff, Rodgers "falsely appear[ed] to be the victim." *Id.* ¶ 74. These statements, plaintiff claims, subsequently "caused Plaintiff

---

[2] Plaintiff filed that lawsuit in 2017. *Watkins v. City of Chi.*, Case No. 1:17-cv-02028 (N.D. Ill.), Dkt. 1. The district court granted summary judgment for the City. *Watkins v. City of Chicago*, No. 17-cv-02028, 2020 WL 1469452 (N.D. Ill. Mar. 26, 2020). The Seventh Circuit affirmed. *Watkins v. City of Chi.*, No. 20-1750, 2023 WL 155450 (7th Cir. Jan. 11, 2023).

to be a recipient of additional harassment based on sex and race stereotyping of the stereotypical, 'angry black woman.'" *Id.* ¶ 76. Plaintiff does not provide any examples of subsequent conduct, statements or otherwise, that elucidates how people treated her that way.

In addition, plaintiff provides several other examples of harassment, none of which, however, involve stereotyping. First, investigators allegedly ignored her emails and signed their names to documents involving her discrimination, which plaintiff alleges is "evidence [the investigators] were fully aware of participating in [a] coverup and retaliation." *Id.* ¶¶ 78–79. Second, she alleges that she was harassed by BIA Chief Yolanda Talley because Talley "failed to timely close and investigate Plaintiff's complaint," and that she was harassed by a BIA Sergeant Frierson when Frierson "included Plaintiff on an" internal BIA email. *Id.* ¶¶ 84–85, 87–88. Third, plaintiff alleges that the BIA "mailed Plaintiff two letters to contact" a BIA sergeant, causing plaintiff to feel "harassed" and "intimidated." *Id.* ¶ 89. Fourth, plaintiff alleges that a BIA sergeant (Christine Otruba) "wasted Plaintiff's time to come to [the] BIA" to view her files "as there were only a few" files "uploaded on the computer." *Id.* ¶ 92. Fifth, plaintiff alleges that Defendant Ursitti "subjected Plaintiff to continuous demeaning tasks" by declining to let her transfer out of the CIT Unit. *Id.* ¶ 94. Finally, plaintiff alleges that Ursitti ordered human resources not to issue her a retirement package "given to all retirees in good standing." *Id.* ¶ 98.[3]

Plaintiff alleges that eventually her "Clinical Therapist advised [her] to quit her job with CPD because her therapist was afraid that the stress, retaliation, isolation, defamation, and harassment was going to kill Plaintiff." *Id.* at ¶ 114. Plaintiff left the CPD on August 15, 2023. *Id.* ¶ 120. Plaintiff alleges that this constituted "constructive[] discharge[]." *Id.*

Plaintiff filed a complaint on May 30, 2024 against the City of Chicago and various individual CPD defendants. [1]. Certain defendants (the City of Chicago and certain individual defendants), in turn, moved to dismiss under Rule 12(b)(6). [19]. (Those defendants represented that upon information and belief, two other

---

[3] Meanwhile, Ursitti was promoted to Deputy Chief of the CPD's Training Academy. *Id.* ¶ 100. Plaintiff claims that this violated her contractual and due process rights. *Id.* ¶ 102. This promotion came along with the demotion of Academy Deputy Chief Daniel Godsel, which plaintiff alleges caused her to "endure unjust investigation, verbal and written harassment," etc.—though it is not clear from the complaint why Godsel's demotion impacted her. *Id.* ¶ 103–04. Plaintiff also alleges that Ursitti "attempted via Plaintiff's direct supervisor" "to trick [her] back to patrol" but that she "did not leave the CIT Unit" because she "sensed a scheme" to assign her back to patrol. *Id.* ¶¶ 109–12.

defendants, Karen Konow and Tina Skahill, were former employees of the City and had not been properly served. *Id.* at 1 ¶ 3.)

## LEGAL STANDARD

Before the court is a motion to dismiss under Rule 12(b)(6). When reviewing a motion to dismiss under Rule 12(b)(6), the court "accept[s] as true all factual allegations in the complaint and draw[s] all permissible inferences in plaintiffs' favor." *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 365 (7th Cir. 2018). A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "'[N]aked assertion[s]' devoid of 'further factual enhancement,'" however, are insufficient. *Id.* (quoting *Twombly*, 550 U.S. at 557).

## DISCUSSION

Plaintiff brings a bevy of accusations. Plaintiff's complaint, however, is not crystal clear as to exactly what her legal theories are. That said, the parties' Joint Initial Status Report, [21], sheds some light. The parties agree that plaintiff alleges claims under Title VII of the Civil Rights Act (codified at 48 U.S.C. § 2000e *et seq.*), under 42 U.S.C. § 1983 for violations of U.S. Const. amend. I (for both individual and entity liability), and finally the Illinois Whistleblower Act (codified at 740 Ill. Comp. Stat. 174/1 *et seq.*).[4] Because plaintiff's federal claims fail, the court declines to exercise supplemental jurisdiction over plaintiff's Illinois Whistleblower Act claim. *See, e.g.*, *Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 31–32 (2025); *Burritt v. Ditlefsen*, 807 F.3d 239, 252 (7th Cir. 2015).

## I.     Title VII Claims

Title VII forbids an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Such unlawful conduct can happen in several ways, and plaintiff asserts two: hostile work environment and constructive discharge. She also brings a separate claim under

---

[4] Plaintiff's complaint does not cite the Fourteenth Amendment, mention equal protection, or in any way indicate that she has brought an equal protection claim. So while the joint status report lists such a claim, [21], the court finds that such claim was not alleged. Inasmuch as plaintiff did bring such a claim, plaintiff has not identified in anything more than a conclusory fashion either any rule that makes distinctions based on a suspect class, or unequal treatment based on a suspect class, so the claim must be dismissed. *See United States v. Skrmetti*, 145 S. Ct. 1816, 1828 (2025); *Swanson v. City of Chetek*, 719 F.3d 780, 783 (7th Cir. 2013).

42 U.S.C. § 2000e-3(a) for retaliation. Under that section it is "an unlawful employment practice for an employer to discriminate" against an employee because she "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." These claims are addressed in turn.

## A. Hostile Work Environment

"To state a hostile work environment claim," a "plaintiff must allege that: (1) he 'was subject to unwelcome harassment'; (2) 'the harassment was based on [a protected characteristic]'; (3) 'the harassment was severe or pervasive so as to alter the conditions of employment and create a hostile or abusive working environment'; and (4) 'there is basis for employer liability.'" *See Alamo v. Bliss*, 864 F.3d 541, 549 (7th Cir. 2017) (quoting *Huri v. Off. of the Chief Judge of the Circuit Ct. of Cook Cnty.*, 804 F.3d 826, 833–34 (7th Cir. 2015)).

Plaintiff's hostile work environment claim is legally deficient. "To survive . . . a motion to dismiss, a plaintiff need only allege enough facts to allow for a *plausible* inference that the" hostile environment she faced "*was connected to* her protected characteristics." *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 777 (7th Cir. 2022) (emphasis added). That's because "Title VII does not prohibit all verbal or physical harassment in the workplace," but rather "is directed only at 'discriminat[ion].'" *Jajeh v. Cnty. of Cook*, 678 F.3d 560, 569 (7th Cir. 2012) (alteration in original) (first quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998); and then quoting 42 U.S.C. § 2000e-2(a)(1)).

Plaintiff's complaint does not allege enough facts to allow for a plausible inference that her allegedly hostile work environment was related to any of her protected characteristics. Plaintiff has alleged that she had a workplace dispute (verbal altercation) with a coworker (Rodgers), that later there was an all staff meeting in which she and Rodgers argued about their prior argument, that she filed internal complaints about the dispute, and that she was dissatisfied with how those complaints were handled and resolved. The complaint fails to identify any protected characteristic-based treatment. [24] at 7. Save one conclusory assertion, *see* [1] ¶ 76, plaintiff has not alleged that any of the allegedly hostile treatment she endured had any connection to her status as an African American or as a woman, or because of any other protected characteristic. That is insufficient under modern pleading standards. *See Twombly*, 550 U.S. at 556–58. Nor, on the allegations before the court, would drawing a causal connection be anything more than speculation. Plaintiff has protected characteristics and has alleged that her work environment was hostile, but those allegations standing alone are insufficient. *Cf. Kaminski*, 23 F.4th at 776–77 ("Beyond saying Elite Staffing wrongfully discharged her, Kaminski includes no factual allegations directly or indirectly connecting the termination with her national origin, age, or race.").

Further, the conduct plaintiff alleges does not rise to the level of a hostile work environment, providing an independent basis for dismissal. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *see also Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 564 (7th Cir. 2009) (at summary judgment, "repeated driving evaluations and . . . fitness for duty examinations" did not "amount[ ] to demeaning, degrading, or hostile behavior by the defendants"). Again, plaintiff has alleged that she had a workplace dispute (verbal altercation) with a coworker (Rodgers), that later there was an all staff meeting in which she and Rodgers argued about their prior argument, that she was required to write a report about the prior argument, that she filed internal complaints, and that she was dissatisfied with how those complaints were handled and resolved. Ultimately, these allegations reflect a workplace conflict and the subsequent resolution process. In other cases, allegations of a hostile work environment might be too factbound to be susceptible to resolution at the pleading stage; but here, even taking all of plaintiff's allegations as true, the allegations as a whole do not amount to conduct sufficiently severe or pervasive to support a hostile work environment claim.

Plaintiff's claim is accordingly dismissed for failure to state a claim.

## B. Constructive Discharge

A Title VII constructive discharge claim is similar to a Title VII hostile work environment claim. "Constructive discharge, like actual discharge, is a materially adverse employment action." *E.E.O.C. v. Univ. of Chi. Hosps.*, 276 F.3d 326, 331 (7th Cir. 2002). "[T]o demonstrate constructive discharge, the plaintiff must show that she was forced to resign because her working conditions . . . had become unbearable." *Id.*

But, again, this is a Title VII claim. To prevail on a Title VII constructive discharge claim, a plaintiff cannot merely show she was bullied into quitting. Rather, she must "show that the constructive discharge was motivated by discriminatory intent." *Id.* at 333. And like with her hostile work environment claim, plaintiff fails to allege facts sufficient to plausibly connect the dots between her treatment and a protected characteristic. So her claim is dismissed.

## C. Retaliation

"To state a claim for retaliation under Title VII, a plaintiff must allege that he 'engaged in statutorily protected activity' and suffered an adverse action 'as a result of that activity.'" *Alamo*, 864 F.3d at 555 (quoting *Huri*, 804 F.3d at 833).

Plaintiff alleges several different "statutorily protected activit[ies]"—specifically, the filing of her 2017 discrimination case (along with her appeals of that

case after the district court granted summary judgment against her) and the internal complaints she submitted several years later. [1] ¶¶ 1, 59–60, 69–70, 84. Defendants contend that, as a matter of law, only the 2017 case counts. [20] at 10 (motion to dismiss). In support of their contention, defendants point to *Hatmaker v. Memorial Medical Center*, where the Seventh Circuit found that "[a] purely internal investigation" does not constitute a statutorily protected activity for purposes of Title VII. 619 F.3d 741, 747 (7th Cir. 2010). *Hatmaker* explains that because Title VII prohibits retaliation for participating in hearings brought under Title VII, *see* 42 U.S.C. § 2000e-3, "[t]o bring an internal investigation" unconnected to any charge of discrimination "within the scope of the clause" would "rewrite the statute." *Hatmaker*, 619 F.3d at 747.[5] The court agrees and considers plaintiff's 2017 discrimination claim as her only protected activity.

The next question, then, is whether plaintiff's complaint causally connects any adverse actions to her 2017 discrimination claim. It does not. As retaliatory actions, plaintiff alleges several events. First, on May 3, 2023, BIA Chief Talley closed one of her internal complaints. [1] ¶ 84. Second, on July 22, 2023, BIA Chief Talley failed to timely investigate one of her internal complaints. *Id.* ¶ 85–86. Third, in April of 2024, the BIA sent her a letter urging her to contact the BIA, which "cause[d] Plaintiff to feel harassed." *Id.* ¶¶ 89–90. And finally, in June of 2023, the BIA "wasted Plaintiff's time" by having her come in to the "BIA and attempt to view her file" but only showed her "a few selected files." *Id.* ¶ 92. But these are insufficient for several reasons.

To start, it is doubtful that any of these incidents constitute adverse actions in the context of a retaliation claim. "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Poullard v. McDonald*, 829 F.3d 844, 857 (7th Cir. 2016) (quotation omitted). Rather, the action must be "serious enough to dissuade a reasonable employee from engaging in protected activity." *Id.* at 858; *see also Muldrow v. City of St. Louis*, 601 U.S. 346, 357 (2024) (Title VII's retaliation provision only "capture[s] those (and only those) employer actions serious enough to dissuade a reasonable worker from making or supporting a charge of discrimination." (cleaned up) (quotation omitted)). Plaintiff has not described how the seemingly ordinary processing of her internal complaints satisfies that showing. Nor does the court find such a showing plausible on the facts alleged, as plaintiff has alleged no more than the day-to-day happenings of bureaucracy.

---

[5] Notably, if her subsequent internal investigations were related to discrimination, the analysis might be different. *See Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 279 (2009) (permitting claims based on retaliation for testimony in an internal investigation about discrimination). Plaintiff, however, has only alleged that her internal complaints were related to an ordinary employment dispute.

But even if those actions count as adverse in the relevant sense, the court is not persuaded that a reasonable factfinder could find a causal connection between plaintiff's 2017 lawsuit and those actions. Plaintiff filed her suit, and for several years nothing happened. Then she started filing internal complaints about a workplace dispute, and some were answered too quickly, some not at all, and some she refused to adequately participate in. That is no common pattern of retaliation for her suit. Plaintiff has alleged nothing more than that at one point in time she engaged in a protected activity, and at another point in time something adverse happened to her. But even at this stage of litigation, "a retaliation claim can indeed be so bare-bones that a lengthy time period between the protected activity and the alleged retaliation will make any causal connection between the two implausible." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014). "If the best a plaintiff can do is allege that he engaged in protected activity and then, years later, the employer took an adverse action . . . , the claim may not be permitted to proceed." *Id.* (citing *Carmody v. Bd. of Trs. of the Univ. of Ill.*, 747 F.3d 470, 480 (7th Cir. 2014)). Indeed, the Seventh Circuit has regularly found at the summary judgment stage that gaps of several months defeat any reasonable inference of retaliation. *See, e.g., Benuzzi v. Bd. of Educ. of the City of Chi.*, 647 F.3d 652, 666 (7th Cir. 2011); *Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882, 895 (7th Cir. 2001). While there is "no bright-line timing rule" that "can be used to decide whether a retaliation claim is plausible or whether it should go to a jury," here the "facts and circumstances" alleged do not permit a reasonable inference of causation between plaintiff's 2017 suit and the allegedly adverse actions she endured. *Carlson*, 758 F.3d at 829 (quotation omitted).

Accordingly, defendants' motion to dismiss this count is granted.

## II.    § 1983 Claims

### A.    First Amendment Retaliation Claim

Plaintiff, at points, suggests that her internal complaints (and the BIA's subsequent treatment of those complaints) constitute First Amendment retaliation. "To make out a prima facie case of first amendment retaliation, a public employee must present evidence that: (1) his speech was constitutionally protected, (2) he has suffered a deprivation likely to deter free speech, and (3) his speech was at least a motivating factor in the employer's action." *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).

Plaintiff cannot satisfy prong (1). Her claim boils down to an employment dispute—she reported someone for harassment and the internal body tasked with evaluating her claim did not address it in a satisfactory matter. But "not every legal gesture—not every legal pleading—is protected by the First Amendment." *Yatvin v. Madison Metro. Sch. Dist.*, 840 F.2d 412, 419 (7th Cir. 1988). Rather, when an employee wants to advance her private interests, as opposed to "promot[ing] a cause,"

8

the fact that complaints involve speech does not turn that complaint into protected speech. *Id.* Here plaintiff has not advanced a cause; she has merely complained about a dispute with a coworker. And that, without more, does not give rise to a § 1983 claim for First Amendment retaliation. *See also Janus v. Amer. Fed. of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 905 (2018). Accordingly, defendants' motion to dismiss this claim is granted.

### B.     First Amendment *Monell* Claim

Plaintiff also brings a *Monell* claim, arguing that Chicago maintains "a systemic practice, custom, and policy of retaliating against employees who exercise their First Amendment rights and report misconduct." [1] ¶ 1; *see generally Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658 (1978). To hold Chicago liable, plaintiff would need to allege facts sufficient to conclude that she was subject to an "unconstitutional act" that was "caused by: (1) an official policy adopted and promulgated by [Chicago's] officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority. *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010).

Plaintiff's argument is that CPD's "code of silence" constitutes a widespread custom of covering up complaints against police officers, as well as punishing police officers who bring them. [1] ¶ 115–23. But plaintiff's complaint does not adequately allege that this "code of silence" affected her. Even assuming it exists, plaintiff's complaint alleges that CPD had a system for processing complaints and actively processed several of her complaints. [1] ¶¶ 84, 89–90. Additionally, a *Monell* claim requires as a predicate condition that there is an underlying constitutional violation. But as explained above, plaintiff has not alleged that she engaged in any protected speech. For these reasons, defendants' motion to dismiss is granted.[6]

### CONCLUSION

Defendants' motion to dismiss, [19], is granted in its entirety. If plaintiff can do so consistent with this opinion and Rule 11, she may file by October 30, 2025 a motion for leave to amend the complaint, as this opinion is the court's first ruling on the merits. *Runnion*, 786 F.3d at 518. Any motion for leave to amend the complaint must attach a proposed amended complaint showing the changes from the original complaint.

---

[6] While it is not a requirement that one of Chicago's "employees" must have been "found to have violated [Plaintiff's] constitutional rights" to impose *Monell* liability, the court notes that *Monell* liability would be inconsistent with the legal determination that plaintiff has not alleged that she engaged in protected speech. *Thomas*, 604 F.3d at 304–05.

9

Dated: September 30, 2025          <u>/s/ Martha M. Pacold</u>